EXHIBIT "C"

LEXSEE 2006 U.S. DIST. LEXIS 11054

**ALETHA FASSL, Plaintiff v. OUR LADY OF PERPETUAL HELP ROMAN CATHOLIC CHURCH, Defendant**

**CIVIL ACTION NO. 05-CV-404**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2006 U.S. Dist. LEXIS 11054; 152 Lab. Cas. (CCH) P35,146*

**March 13, 2006, Decided**

**PRIOR HISTORY:** *Fassl v. Our Lady of Perpetual Help Roman Catholic Church, 2005 U.S. Dist. LEXIS 22546 (E.D. Pa., Oct. 4, 2005)*

**COUNSEL:** [*1]  For ALETHA FASSL, Plaintiff: DONALD P. RUSSO, DONALD P. RUSSO, ESQUIRE, BETHLEHEM, PA.

For OUR LADY OF PERPETUAL HELP ROMAN CATHOLIC CHURCH, Defendant: SEAN M. HART, HEIMBACH SPITKO & HECKMAN, ALLENTOWN, PA.

**JUDGES:** GENE E.K. PRATTER, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** GENE E.K. PRATTER

**OPINION:** PRATTER, DISTRICT JUDGE

### MEMORANDUM AND ORDER

On December 23, 2004, Plaintiff Althea Fassl filed a complaint in state court in Northampton County alleging Defendant Our Lady of Perpetual Help Roman Catholic Church (the "Church") violated the Americans with Disabilities Act of 1990, *42 U.S.C. § § 12101 et seq.* ("ADA"), the Family and Medical Leave Act of 1993, *29 U.S.C. § § 2601 et seq.* ("FMLA") and the Pennsylvania Human Relations Act, *43 PA. CONS. STAT. ANN. § 955(d)* ("PHRA"). On January 28, 2005, the Church filed the Notice of Removal based upon federal question jurisdiction, and the litigation proceeded in this Court.

On February 4, 2005, the Church filed a Motion to Dismiss Ms. Fassl's complaint pursuant to *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(6)* [*2]  , which Ms. Fassl opposed. The Court held oral argument on April 14, 2005, during which the Court issued an order permitting the parties to conduct limited discovery regarding the *Rule 12(b)(1)* jurisdictional challenge. Specifically, the parties were authorized to take discovery to determine the application of the "ministerial exception" to the Court's exercise of jurisdiction over Ms. Fassl's claims. On or about April 25, 2005, the Court received a stipulation from the parties acknowledging both the voluntary withdrawal of Ms. Fassl's ADA claim and that Ms. Fassl had served in the Church in a ministerial capacity. Ms. Fassl, however, declined to withdraw her FMLA claim, asserting that the "ministerial exception" did not apply to the FMLA. Thereafter, the parties submitted post-argument legal memoranda regarding the *Rule 12(b)(1)* grounds for dismissal, as well as the application of the "ministerial exception" to the FMLA claim.

On October 5, 2005, the Court issued its Opinion granting the Church's Motion to Dismiss and dismissed all of Ms. Fassl's claims with prejudice. *Fassl v. Our Lady of Perpetual Help Roman Catholic Church, No. 05-404, 2005 U.S. Dist. LEXIS 22546, 2005 WL 2455253 (E.D. Pa. Oct. 5, 2005)* [*3]  (hereinafter "Fassl Opinion at   "). On October 13, 2005, Ms. Fassl filed a Motion for Reconsideration with an accompanying Memorandum of Law. On November 14, 2005, the Church filed its Response as well as a Motion for Attorney's Fees, to which Ms. Fassl responded. For the reasons set forth below, Ms. Fassl's Motion for Reconsideration is denied, as is the Church's Motion for Attorney's Fees.

## I. DISMISSAL OF MS. FASSL'S FMLA CLAIMS

Ms. Fassl performed ministerial responsibilities as the Director of Music for the Church. n1 As its Director of Music, the Church considered Ms. Fassl to be a non-ordained liturgical minister who was an integral part of the pastoral and spiritual mission of the Church, and not simply a member of the custodial, clerical, or office personnel. Ms. Fassl herself repeatedly referred to her employment as her ministry, and, eventually, she admitted, by way of the Stipulation presented to the Court after a lively and fulsome oral argument on the issue, that her responsibilities as Director of Music were ministerial in nature.

> n1 The Court here refers only to the facts relevant and necessary for consideration of the pending motions for reconsideration and attorney's fees. A more comprehensive recitation of the facts and procedural history of the case can be found in the Court's Opinion dismissing Ms. Fassl's claims. *Fassl v. Our Lady of Perpetual Help Roman Catholic Church, No. 05-404, 2005 U.S. Dist. LEXIS 22546, 2005 WL 2455253 (E.D. Pa. Oct. 5, 2005).*

[*4]

In her Complaint, Ms. Fassl alleged that she has a neurological disorder, and, as a result of her condition, was experiencing ambulatory difficulties and decreased stamina and energy in late 2001. On or about December 20, 2001, Ms. Fassl claims she approached Reverend Monsignor Edward Sacks and requested a "break" from her employment as Director of Music. Msgr. Sacks reportedly denied her request after Ms. Fassl informed him that she did not know how long of a break she would need. Ms. Fassl claims that, at that point, she had no choice but to resign from her position, which she did in writing. Subsequently, Ms. Fassl allegedly requested reinstatement, which was apparently denied. Ms. Fassl then filed a "Charge of Discrimination" with the EEOC, and allegedly requested that the EEOC dual-file her charge with the Pennsylvania Human Relations Commission ("PHRC"). Ms. Fassl reportedly received her right-to-sue notice from the EEOC on November 17, 2004. Thereafter, Ms. Fassl instituted suit against the Church alleging violations of her rights under the ADA, FMLA, and PHRA.

The Church challenged Ms. Fassl's claims with a *Rule 12(b)(1)* motion questioning the Court's subject matter jurisdiction [*5] based on the application of the "ministerial exception," which exempts employment relationships between religious institutions and their "ministers" from various federal employment laws. Ms. Fassl responded, and, as indicated above, the Court held oral argument, during which Ms. Fassl's counsel denied that the ministerial exception was applicable factually to Ms. Fassl and legally to the FMLA, and requested leave to undertake certain discovery. The Court permitted the parties to conduct limited discovery to determine the application of the ministerial exception to Ms. Fassl in light of her responsibilities as the Director of Music for the Church. There is no indication that the parties conducted any such discovery. Rather, the parties sent the stipulation to the Court in which Ms. Fassl admitted that her duties were ministerial in nature and agreed to dismiss her ADA claim. Ms. Fassl, however, declined to withdraw her FMLA claim, asserting that the ministerial exception is inapplicable to the FMLA.

In its October 5, 2005 Opinion, the Court dismissed Ms. Fassl's remaining claims, including her claim that the Church violated the FMLA. The Court found the "ministerial exception" applicable [*6] to claims by ministers pursuant to the FMLA. n2 Thereafter, Plaintiff Fassl filed a Motion for Reconsideration. The Church responded and also filed a Motion for Attorney's Fees.

> n2 In the Court's October 5, 2005 Opinion, the Court held that, as with other federal employment-related laws, the *Free Exercise Clause of the First Amendment to the United States Constitution* barred its jurisdiction over Ms. Fassl's FMLA employment law claims.
>
> The *Free Exercise Clause* states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]". *U.S. CONST. amend. I.* The *Free Exercise Clause* precludes the application of the ADA, FMLA, and PHRA to religious organization employees such as ministers, teachers, and other individuals whose duties are "integral to the spiritual and pastoral mission." *EEOC v. Roman Catholic Diocese of Raleigh, 213 F.3d 795, 797 (4th Cir. 2000).* This "ministerial exception" derives from the fundamental principle of separation of church and state as set forth by our Founding Fathers, and the purpose of the "ministerial exception" is to prevent encroachment by the government into an area of religious freedom which it is forbidden to enter by the principles established by the *Free Exercise Clause.*

[*7]

## II. PLAINTIFF'S MOTION FOR RECONSIDERATION

### A. Standard of Review Applicable to Motions for Reconsideration

The purpose for a motion for reconsideration is to correct manifest errors of law or fact, or to present newly discovered evidence. *Max's Seafood Cafe v. Max Quinteros, 176 F.3d 669, 677 (3d Cir. 1999).* Thus, a prior decision may be altered or amended only if the party seeking reconsideration establishes at least one of the following grounds: (1) an intervening change in controlling law; (2) the availability of new evidence that was not available when the district court decided the motion under consideration; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. Id. (citing *N. River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995)).* Moreover, "because federal courts have a strong interest in finality of judgments, motions for reconsideration should be granted sparingly." *Continental Casualty Co. v. Diversified Indus., Inc., 884 F. Supp. 937, 943 (E.D. Pa. 1995);* see also *Rottmund v. Continental Assurance Co., 813 F. Supp. 1104, 1107 (E.D. Pa. 1992).* [*8]  A motion to reconsider may not raise new arguments that could or should have been made in support of, or in opposition to, the original motion. *Burger King Corp. v. New Eng. Hood and Duct Cleaning Co., No. 98-3610, 2000 U.S. Dist. LEXIS 15171, at *3-4 (E.D. Pa. Oct. 18, 2000); Balogun v. Alden Park Mgmt. Corporation/Eastview Realty Assocs., L.P., No. 98-0612, 1998 U.S. Dist. LEXIS 15499, at *2 (E.D. Pa. Oct. 1, 1998).*

Here, Ms. Fassl cannot meet the standard for a successful reconsideration of the order which displeases her because: (1) there has been no change in controlling law between the Court's decision and the filing of the motion for reconsideration; (2) no previously unavailable evidence has come to light; nor (3) is there any error to correct or injustice to prevent. Thus, for the reasons set out more fully below, the Motion for Reconsideration is denied.

### B. Ms. Fassl Cannot Meet the Standard for Reconsideration

Ms. Fassl argues that the Court failed to adequately consider three pieces of evidence, two that were part of the record, and one that was available but not submitted to the Court, at the time of consideration. Specifically, Ms. Fassl asserts that the Court [*9]  did not sufficiently address a "violation letter" issued on December 11, 2003 by the United States Department of Labor ("DOL"), the federal agency empowered with enforcing the FMLA ("DOL Letter"). Ms. Fassl also argues that the Court did not properly consider her affidavit, in which Ms. Fassl presented double hearsay information that the Allentown Diocese's Human Resource Department informed her husband that she was covered by the FMLA. Ms. Fassl further argues that the Court should consider the May 4, 2002 letter written by Msgr. Sacks to Ms. Fassl's counsel ("Msgr. Sacks' Letter"), which was not part of her presentation initially, but which purportedly gave Ms. Fassl reason to believe her circumstances were covered by the FMLA. Finally, Ms. Fassl asks the Court to consider that the language and regulations of the FMLA do not specifically refer to the "ministerial exception."

The Court finds that Ms. Fassl's arguments regarding the three documents and legal considerations do not support reconsideration. First, there has been no change in controlling law between the time of the Court's decision and the filing of the motion for reconsideration. Second, no evidence not previously available [*10]  has come to light. The record at the time of consideration contained both the DOL letter and Ms. Fassl's affidavit. These two documents, one of which, namely, the affidavit, presents hearsay on hearsay without even identifying an actual person at the Diocesan Human Resources Department who allegedly spoke to Ms. Fassl's husband, were irrelevant to the Court's determination that constitutional considerations were at play. The Church was protected from Ms. Fassl's FMLA suit by the *Free Exercise Clause of the First Amendment.* Neither the letter from the DOL nor Plaintiff's affidavit regarding a purported nonspecific admission by the Human Resources Department can undo that which the United States Constitution commands. Furthermore, Msgr. Sacks' Letter, written directly to Plaintiff's counsel, was available at the time of the Court's consideration of the motion to dismiss, but Ms. Fassl by then did not bring it to the Court's attention. No reference to it was made in the Complaint, during oral argument, in briefing, or with the stipulation submitted by counsel. Thus, this document may not properly be considered as grounds for reconsideration. n3 Third, there is no clear error of law or [*11]  fact to correct or manifest injustice to prevent. Although Ms. Fassl points to the regulations and language of the FMLA in an effort to show that there is no language in the law itself regarding the "ministerial exception," the lack of verbiage is immaterial for purposes of *First Amendment* protection. Thus, the Court finds that Ms. Fassl is not entitled to reconsideration of the Court's determination that dismissal of her claims was proper. The Court does find, however, that the foregoing evidence and arguments are pertinent to its determination of the propriety of awarding attorney's fees in this case.

n3 If the Court were to consider Msgr. Sacks' Letter, however, it could well find the letter to be irrelevant to the jurisdictional issue in this case. As noted above, the Church is constitutionally entitled to protection from employment-related claims by its ministers, and the Letter does not state any intentional waiver of such constitutional protection. The Court does, however, consider that this letter is relevant to the Court's determination regarding attorney's fees.

[*12]

## II. DEFENDANT'S MOTION FOR ATTORNEY'S FEES AND COSTS

The Church seeks the imposition of attorney's fees under the ADA, FMLA, *Rule 11 of the Federal Rules of Civil Procedure*, the Federal Cost Statute, *28 U.S.C. § 1927*, and the PHRA. In contrast, Ms. Fassl argues that attorney's fees are inappropriate in this case because she made all allegations against the Church in good faith, and her complaint was "reasonable under the circumstances."

### A. Attorney's Fees Pursuant to the ADA

The fee-shifting provision of the ADA provides that, "in any action . . . commenced pursuant to this chapter, the court . . ., in its discretion, may allow the prevailing party . . . a reasonable attorney's fees, including litigation expenses, and costs . . . ." *42 U.S.C. § 12205*. In order to recover such fees, the prevailing defendant must show that the "plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." n4 *Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S. Ct. 694, 54 L. Ed. 2d 648 (1978); Veneziano v. Long Island Pipe Fabrication & Supply Corp., 238 F. Supp. 2d 683, 688 (D.N.J. 2002);* [*13] *Rivera v. City of Philadelphia, No. 97-1130, 1998 U.S. Dist. LEXIS 1749, at \*9 (E.D. Pa. Feb. 19, 1998).* Courts, when considering whether a claim is "frivolous, unreasonable, or without foundation," are to assess: (1) whether the plaintiff established a *prima facie* case; (2) whether the defendant offered to settle; (3) whether the trial court dismissed the case prior to the trial or held a trial on the merits; (4) whether the issue was one of first impression requiring judicial resolution; and (5) whether the controversy is based sufficiently upon a real threat of injury to the plaintiff. See *Barnes Found. v. Twp. of Lower Merion, 242 F.3d 151, 158 (3d Cir. 2001); EEOC v. L.B. Foster Co., 123 F.3d 746, 751 (3d Cir. 1997); Veneziano, 238 F. Supp. 2d at 688.* Determinations of frivolity must be made on a case-by-case basis. *L.B. Foster Co., 123 F.3d at 751.*

n4 The Third Circuit generally treats case law under the ADA and Title VII interchangeably when there is no material difference in the question being addressed. See *Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div., 60 F.3d 153, 157 (3d Cir. 1995).*

[*14]

The Supreme Court, in *Buckhannon Board & Care Home v. West Va. Dept. of Health & Human Resources, 532 U.S. 598, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001),* set forth the standard for determining whether a party is a "prevailing party." In Buckhannon, the Court, held that a "prevailing party" is one who has been awarded some relief by the court, by virtue of a judgment on the merits or settlements enforced through court-ordered consent decrees, which effects a material alteration of the legal relationship of the parties. *Id. at 604.* Private settlements, however, cannot form the basis for becoming a "prevailing party" because they do not "entail the judicial approval and oversight involved in consent decrees." *Id. at 604 n.7; Dorfsman v. Law Sch. Admission Council, Inc., No. 00-306, 2001 U.S. Dist. LEXIS 24044, at \*15-16 (E.D. Pa. Nov. 28, 2001).*

Here, the Church cannot meet the threshold requirement of being a "prevailing party" because Ms. Fassl's voluntary stipulation of dismissal did not require the judicial imprimatur necessary for monetary recoupment. Here, the parties submitted a signed stipulation to the Court in which [*15] Ms. Fassl voluntarily withdrew her ADA claim. *Buckhannon* clarified that the prevailing party must be awarded some relief by the court. The voluntary dismissal of Ms. Fassl's claims did not involve judicial intervention or relief. Thus, the Church's request for attorney's fees pursuant to the ADA is denied.

### B. Attorney's Fees Pursuant to the FMLA

The FMLA does not use the "prevailing party" language found in the ADA, and instead provides that, "the court in such an action shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable

expert witness fees, and other costs of the action to be paid by the defendant." *29 U.S.C. § 2617(a)(3)*. The parties have not provided the Court with any case law regarding the treatment of fees for defendants of FMLA claims in the Third Circuit, and independent research by the Court has not uncovered any such guidance. Other courts have held, however, that the absence of "prevailing party" language is significant because the FMLA, by its own terms, only allows attorney's fees to a plaintiff who has secured a favorable judgment. See *Billings v. Cape Cod Child Dev. Prog., Inc., 270 F. Supp. 2d 175, 176 (D. Mass. 2003)*; [*16] *McDonnell v. Miller Oil Co., 968 F. Supp. 288, 293 (E.D. Va. 1997)*; see also *Stomper v. Amalgamated Transit Union Local 241, 27 F.3d 316, 318-19 (7th Cir. 1994)*. The Court finds that the plain language of the *FMLA* is unambiguous that Congress did not extend to defendants entitlement to attorney's fees pursuant to the FMLA.

## C. Sanctions Pursuant to *Rule 11 of the Federal Rules of Civil Procedure*

*Rule 11 of the Federal Rules of Civil Procedure* requires an attorney who signs a pleading, motion, or other paper to conduct a reasonable pre-filing inquiry to assure that the document "is not being presented for any improper purpose such as to harass or to cause unnecessary delay or needless increase in the cost of litigation" and that the "claims . . . and other legal contentions therein are warranted by law . . . ." *Fed. R. Civ. P. 11(b)(1)-(2)*. Courts utilize an objective standard to examine the reasonableness of the party's conduct under the circumstances. n5 *Business Guides v. Chromatic Commc'ns Ent., 498 U.S. 533, 551, 111 S. Ct. 922, 112 L. Ed. 2d 1140 (1991)*; [*17] *Bradgate Assocs. v. Fellows, Read & Assocs., 999 F.2d 745, 752 (3d Cir. 1993)*. As an initial matter, however, the Court of Appeals for the Third Circuit has promulgated a supervisory rule requiring that "'all motions requesting *Rule 11* sanctions [must] be filed in the district court before the entry of a final judgment' and 'as soon as practicable after discovery of the *Rule 11* violation.'" *Robert S. v. City of Philadelphia, No. 97-6710, 2001 U.S. Dist. LEXIS 13485, at *16 (E.D. Pa. Aug. 28, 2001)* (quoting *Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 100 (3d Cir. 1988)*). The filing of a *Rule 11* motion subsequent to the dismissal of all of the claims violates the safe harbor provisions of *Rule 11* because counsel is not given the opportunity to withdraw or correct the offending documents. *FED. R. CIV. P. 11(c)(1)(A)*; *Progress Fed. Sav. Bank v. Lenders Ass'n, Inc., No. 94-7425, 1996 U.S. Dist. LEXIS 1422, at *9-11 (E.D. Pa. Feb. 12, 1996)* (filing *Rule 11* motion after dismissal of claims violates safe-harbor provision).

n5 Courts consider several factors to analyze an attorney's pre-filing inquiry including: (1) the amount of time available for conducting the factual and legal investigation; (2) the necessity for reliance on a client for underlying factual information; (3) the plausibility of the legal position advocated; (4) the complexity of the legal and factual issues involved; (5) and, if applicable, whether the case was referred to the particular attorney by another member of the bar. *Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 95 (3d Cir. 1988)*; *Morrow v. Blessing, No. 04-1161, 2004 U.S. Dist. LEXIS 20318, *27-29 (E.D. Pa. Sept. 29, 2004)*.

[*18]

The Church contends that *Rule 11* sanctions are appropriate in this case because Plaintiff's counsel did not undertake a reasonable pre-filing inquiry to determine the legal bases for the claims in the complaint. Counsel for Ms. Fassl argues that the Church cannot meet the *Rule 11* standard because the pre-filing inquiry was reasonable under the circumstances, and an imposition of sanctions would "chill zealous advocacy." Although the parties are in sharp disagreement about the propriety of *Rule 11* sanctions in this case, and it is not surprising that the Church questions Plaintiff's counsel's possibly overly zealous advocacy that may have impeded thorough research in advance of aggressive pleading, the fact remains that the Church did not file its Motion for *Rule 11* sanctions until November 14, 2005, well after the issuance of the Court's October 5, 2005 Opinion dismissing all of Ms. Fassl's claims and terminating the case. Thus, because the Motion for *Rule 11* sanctions was filed after closure of the case, such sanctions cannot be granted.

## B. Sanctions Pursuant to the Federal Cost Statute, *28 U.S.C. § 1927*

The Church, in the alternative, seeks the imposition [*19] of sanctions against Plaintiff's counsel pursuant to the Federal Cost Statute, *28 U.S.C. § 1927*. Section 1927 provides that: "any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct." In order to impose such sanctions, the Court must examine whether counsel: "(1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 278 F.3d 175, 188 (3d Cir. 2002)* (citing *Williams v. Giant Eagle Markets, Inc., 883 F.2d 1184, 1191 (3d Cir. 1989)*). Specifically, the Court must find that there was willful bad faith, which is

evident when "'claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment.'" Id. (quoting *Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1375 (6th Cir. 1987)).* [*20]

The Court, after considering the entire record, cannot make a finding here that counsel's "behavior [was] 'of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation.'" *In re Orthopedic Bone Screw Products Liab. Litig., 193 F.3d 781, 795 (3d Cir. 1999)* (quoting *Baker Indus., Inc. v. Cerberus Ltd., 764 F.2d 204, 208 (3d Cir. 1985)).* Although Plaintiff's counsel initially and obdurately refused to acknowledge that Ms. Fassl was a "minister" in the Church in the face of a significant evidentiary array that she was a minister and so considered herself, counsel ultimately acted reasonably by stipulating to that fact and by voluntarily dismissing Plaintiff's ADA claim. Moreover, while the relative dearth of case law regarding the application of the ministerial exception to FMLA claims does not excuse Plaintiff's counsel from thoroughly researching the issues and acting in a similarly reasonable manner with respect to the FMLA claims, the lack of specific FMLA case law combined with the DOL Letter and the May 4, 2002 letter from Msgr. Sacks regarding the possible applicability of the FMLA to Ms. [*21] Fassl here militates against a finding of bad faith. While the Court refuses to condone some of Plaintiff's counsel's tactics, including counsel's consistent failure throughout this litigation to substantively respond to the Church's arguments, the Court appreciates the need for appropriately zealous advocacy (as well as the ethically mandated exercise of independent judgment and competent performance) and does not find that Plaintiff's counsel actually acted in bad faith. Thus, the Court declines to award the Church sanctions pursuant to *Section 1927.* n6

n6 The Court will, however, take this opportunity to commend the Church's counsel for its professional, insightful, and thorough handling of the issues in this case.

### D. Attorney's Fees Pursuant to the PHRA

Finally, the Church argues that attorney's fees are proper pursuant to the PHRA because of Plaintiff's counsel's bad faith conduct. The PHRA provides that a defendant is entitled to an award of attorney's fees if, *inter alia,* the defendant proves [*22] that the complaint was brought in bad faith. As discussed above, after reviewing the entire record, the Court cannot find that Ms. Fassl filed her complaint against the Church in bad faith. Thus, here an award of attorney's fees under the provisions of the PHRA is inappropriate.

The Church, within its argument that attorney's fees are appropriate under the PHRA, also asserts that such fees are also appropriate under *section 2503* of Title 42 of the Pennsylvania Consolidated Statutes Annotated. *Section 2503* allows for an award of attorney's fees for a suit that is commenced which is "arbitrary, vexatious or in bad faith" or "dilatory, obdurate or vexatious conduct during the pendency of a matter." *42 PA. CONS. STAT. ANN. § 2503(5), (9).* "'The aim of the rule is to sanction those who knowingly raise, in bad faith, frivolous claims which have no reasonable possibility of success, for the purpose of harassing, obstructing or delaying the opposing party.'" *In re Estate of Liscio, 432 Pa. Super. 440, 638 A.2d 1019, 1022 (Pa. Super. Ct. 1994)* (quoting *Dooley v. Rubin, 422 Pa. Super. 57, 618 A.2d 1014, 1018 (Pa. Super. Ct. 1993)).* [*23] Here, once again, the Court cannot find that Plaintiff's counsel acted in bad faith, and, thus, counsel fees are not warranted pursuant to *Section 2503.*

## III. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff Fassl has not met her burden for reconsideration of the Court's October 5, 2005 Order. Thus, Plaintiff's Motion for Reconsideration is denied. The Court also finds that attorney costs and fees are not appropriate in this case. Thus, the Defendant's Motion for Attorney's Fees is denied. An appropriate Order consistent with this Memorandum follows.
BY THE COURT:

LEXSEE 2006 U.S. DIST. LEXIS 9267

**Estate of Irwin S. Kalman, by John Kachmarsky, Esquire, Special Administrator of the Estate of Irwin S. Kalman, Plaintiff, vs. United States of America, Defendant.**

**Civil Action No.: 2:04-2442-12**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA, CHARLESTON DIVISION**

*2006 U.S. Dist. LEXIS 9267; 2006-1 U.S. Tax Cas. (CCH) P50,206; 97 A.F.T.R.2d (RIA) 1324*

**February 16, 2006, Decided**

**COUNSEL:** [*1] For Irwin S Kalman, Estate of Irwin S Kalman by John Kachmarsky, Esquire, Special Administrator of the Estate of Irwin S Kalman, administrator of the Estate John Kachmarsky, Plaintiff: Coming Ball Gibbs, Jr, Gibbs and Holmes, Charleston, SC.

For USA, Defendant: John H Douglas, US Attorneys Office, Charleston, SC; Rebeccah L Bower, US Department of Justice, Tax Division, Washington, DC.

**JUDGES:** C. WESTON HOUCK, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** C. WESTON HOUCK

**OPINION:**

**ORDER**

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

This matter is before the Court on the government's *Rule 12(b)(1)* motion to dismiss for the lack of subject matter jurisdiction. The dispute arises out of the Estate of Irwin S. Kalman's (plaintiff) claim for a refund of $ 55,895.55, which represents a tax overpayment made to the United States (defendant) on June 5, 2000. The defendant claims that the plaintiff untimely filed its claim for a refund, and as a result, the Court does not have subject matter jurisdiction to hear an action seeking recovery of the refund.

**Procedural History**

The plaintiff commenced this action on July 22, 2004. On September 27, 2004, the defendant filed its answer, and on November 24, 2004, the [*2] defendant filed a motion to dismiss the claim under *Rule 12(b)(1) of the Federal Rules of Civil Procedure.* On January 11, 2005, the plaintiff responded, and on January 24, 2005, the defendant replied to the plaintiff's response. On March 3, 2005, the Court heard the motion to dismiss and directed the parties to conduct discovery regarding the issue of when the plaintiff mailed the claim for a refund.

On July 18, 2005, the government filed a renewed motion to dismiss pursuant to *Rule 12(b)(1)* and included evidence outside of the pleadings. On July 29, 2005, the plaintiff filed a memorandum opposing the government's motion, and on August 10, 2005, the government replied to the opposition. The Court heard the motion to dismiss on August 29, 2005. At this hearing, the Court recessed to allow the plaintiffs to present additional evidence proving when the tax return was mailed.

On February 3, 2006, the Court conducted an evidentiary hearing to determine if it had jurisdiction to hear the plaintiffs claim. After hearing testimony, gauging the credibility of the witness, and reviewing the exhibits, the evidence presented, and the briefs submitted by [*3] the parties, the Court, pursuant to *Rule 52 of the Federal Rules of Civil Procedure*, makes the following Findings of Fact and Conclusions of Law:

**Findings of Facts**

**1.** On March 5, 1999, Irwin S. Kalman ("Kalman") died.

**2.** On Monday, December 6, 1999, nine months after Kalman's death, the plaintiff mailed a request for a six-month extension to file its United States estate tax return. The plaintiff included a check for $ 114,000.00, which represented its estimate of the taxes the estate owed.

**3.** On June 5, 2000, the plaintiff mailed a Form 706 estate tax return to the Internal Revenue Service (IRS) by certified mail. The IRS received the return on June 7, 2000.

**4.** Subsequent to the filing of the original return, Mr. Kalman's surviving spouse received her elective share of the estate in the amount of $ 55,895.55. The plaintiff seeks a refund in this amount plus interest.

**5.** On June 4, 2003, John Kachmarsky and Frederick Joseph Bradshaw, IV, prepared two sets of federal and state amended tax returns. One set was to be sent to the South Carolina Department of Revenue and the other to the IRS.

**6.** The [*4] set sent to the South Carolina Department of Revenue included the identical federal amended tax return sent to the IRS.

**7.** The envelopes carrying the tax returns were postmarked at John Kachmarsky's office using a private postage meter. The date function on the postage meter had been switched off. n1 As a result, the envelopes carrying the returns did not have postmark dates on them.

> n1 The record reveals no explanation of why the date function was switched off. The plaintiff speculates that the date function was left off when a return envelope was metered.

**8.** On Thursday, June 5, 2003, John Kachmarsky placed two envelopes carrying the amended tax returns in a postal box in front of his office. One envelope was addressed to the South Carolina Department of Revenue and the other addressed to the IRS in Cincinnati, Ohio.

**9.** The South Carolina Department of Revenue received one set of the returns on Friday, June 6, 2003. The envelope carrying the returns mailed to the South Carolina Department [*5] of Revenue was postmarked using a private postage meter. No date appeared on the postmark.

**10.** The IRS does not receive mail on Saturday or Sunday.

**11.** The estimated time a first class piece of mail takes to arrive from Charleston to Cincinnati is two days.

**12.** The IRS received the plaintiff's amended estate tax return on June 9, 2003.

**13.** Based on all of the circumstances, including John Kachmarsky's testimony that he mailed the return on June 5, 2003, and the South Carolina Department of Revenue's receipt of the identical federal tax return on June 6, 2003, the Court finds that John Kachmarsky placed the amended tax return in the mail box in front of his office on June 5, 2003.

**14.** The IRS disallowed the plaintiff's refund claim by a letter dated August 8, 2003.

**15.** The United States Postal Service does not postmark privately metered mail. Persons using private postage meters are responsible for dating the postmarks created by the private postage meters.

**16.** The plaintiff only provides evidence of mailing and not of a postmark.

**17.** The government did not contribute to the return's lack of a postmark date or late receipt.

[*6] **Conclusions of law**

**A.** The plaintiff claims it has erroneously paid the United States a federal estate tax, and the plaintiff seeks to recover the tax from the United States. As a result, the plaintiff alleges the Court has subject matter jurisdiction under *28 U.S.C. § 1346(a)(1)*.

**B.** "The United States consents to be sued for tax refunds only when the refund is filed in accordance with the Internal Revenue Code." *Hull v. United States, 146 F.3d 235, 238 (4th Cir. 1998)*. A failure to timely file a claim for a tax refund is a jurisdictional defect which bars a taxpayer from bringing suit to recover the tax. *26 U.S.C. § § 6511(a)* and *7422(a)*; see *United States v. Dalm, 494 U.S. 596, 601-602, 110 S. Ct. 1361, 108 L. Ed. 2d 548 (1990)*.

**C.** A taxpayer must file a claim for a refund of an estate tax overpayment within three years from the time the estate tax return was filed. *26 U.S.C. § 6511(a)*.

**D.** The deadline to file a claim for a refund runs from the time the plaintiff filed the return, here June 5, 2000. See *26 U.S.C. § 6513(a)*; and *United States v. Habig, 390 U.S. 222, 225-227, 88 S. Ct. 926, 19 L. Ed. 2d 1055, 1968-2 C.B. 589 (1968)*. [*7] The claim, therefore, was due on Thursday, June 5, 2003. The plaintiff does not dispute this conclusion.

**E.** Unless an applicable statute or regulation provides otherwise, a document is "filed" when the IRS receives the document. See *Hull v. United States, 146 F.3d 235, 239 (4th Cir. 1998)*. The IRS received the plaintiff's claim for a refund on Monday, June 9, 2003.

**F.** Under *26 U.S.C. § 7502(a)(1)*, when a claim is received after a due date, the date of a United States Postal Service postmark found on the envelope carrying a document required to be filed is deemed the date of delivery. Delivery in this context means filing. *Hull, 146 F.3d at 239*.

**G.** Prior to the enactment of *section 7502*, courts applied a presumption of timely delivery in due course of the mails. *Arkansas Motor Coaches v. C.I.R., 198 F.2d 189, 191 (8th Cir. 1952)*; see also *Wells Marine, Inc. v. Renegotiation Board, 54 T.C. 1189, 1192 (1970)*. The plaintiff in this case, however, mailed the return on the morning of June 5, 2003, the final day before the statute of limitations expired. The return could not have [*8] been received by the IRS on or before June 5, 2003. As a result, the common law presumption of timely delivery does not help the plaintiff.

**H.** *Section 7502* applies in the case of postmarks not made by the United States Postal Service, to the extent allowed by the regulations promulgated under the authority of *section 7502*. *26 U.S.C. § 7502(b)*. The regulations afford a taxpayer who does not have a United States Postal Service postmark date of the timely mailed exception provided by *section 7502*. *26 C.F.R. § 301.7502-1(c)(iii)(B) (2005)*.

**I.** This regulation requires that the private postmark bear a legible date on or before the last day of the period prescribed for filing a claim. *26 CFR § 301.7502-1(c)(iii)(B)(i)*. The plaintiff's claim for a refund does not have a postmark date on it. The plaintiff's claim for a refund, consequently, does not comply with *section 7502* or Treasury regulation *§ 301.7502-1(c)(iii)(B)*.

**J.** A split of authority exists between the Circuits on whether evidence besides an envelope with a timely postmark is admissible to demonstrate compliance with *section* [*9] *7502*. The Second and Sixth Circuits hold that actual delivery of an envelope with the postmark constitutes the only satisfactory form of proof and no other extrinsic evidence of mailing can be considered. *Spencer Medical Associates v. C.I.R., 155 F.3d 268, 271 (4th Cir. 1998)*(citing *Carroll v. Commissioner, 71 F.3d 1228, 1232-33 (6th Cir. 1995)* and *Washton v. United States, 13 F.3d 49, 50 (2d Cir. 1993))*. The Eighth and Ninth Circuits allow extrinsic evidence to prove a timely postmark. *Spencer Medical Associates, 71 F.3d at 271-72* (citing *Anderson v. United States, 966 F.2d 487, 489-491 (9th Cir. 1992)*(testimony from taxpayer and friend of taxpayer that return was mailed and postmarked before deadline sufficient to prove return, which was never received by the IRS, was timely mailed) and *Estate of Wood v. Commissioner, 909 F.2d 1155, 1159-61 (8th Cir. 1990)*(although return never received by the IRS, testimony by attorney and postal clerk that return was postmarked and mailed before deadline is sufficient to prove return was timely mailed)).

**K.** In Spencer Medical Associates, [*10] the Fourth Circuit Court of Appeals did not expressly adopt either rule listed above but appeared to support the more lenient rule applied by the Eighth and Ninth Circuits allowing proof of a timely postmark. *Spencer Medical Associates, 155 F.3d at 271-272*.

**L.** Alone, proof of timely mailing is not sufficient to demonstrate compliance with *section 7502*. *Section 7502* provides that the date of a postmark serves as the date of delivery. "In enacting *section 7502*, Congress intended to eliminate the random distribution of hardships occasioned by variations in postal performance." *Curry v. C.I.R., 571 F.2d 1306, 1308 (4th Cir. 1978)*. The statute deals with the problem of late mail delivery. Id. *Section 7502* should not be construed to allow the government to frustrate a taxpayer's access to court. Id. Cases allowing a taxpayer to prove compliance with *section 7502* through proof of timely mailing have done so to prevent the government's loss of a return or failure to postmark an envelope to deny a taxpayer's access to court. *Sylvan v. C.I.R., 65 T.C. 548 (1975)*; *Skolski v. C.I.R., 351 F.2d 485 (3rd Cir. 1965)*; [*11] *Curry v. C.I.R., 571 F.2d 1306 (4th Cir. 1978)*.

The United States Postal Service does not postmark privately metered mail, and the fault for the lack of a postmark date lies with the plaintiff. The policy reasons present in the cases allowing proof of timely mailing to demonstrate compliance with *section 7502* are not present in this action. The Court holds that the plaintiff's proof of mailing is not

sufficient to demonstrate compliance with *section 7502*. The claim for a refund, consequently, was filed on June 9, 2003, when the IRS received the claim.

   **M.** Under *sections 6511* and *7422*, the Court lacks subject matter jurisdiction over this suit and must dismiss the case under *Rule 12(b)(1) of the Federal Rules of Civil Procedure*. See *Dalm, 494 U.S. at 602*. This action is hereby dismissed.

   **AND IT IS SO ORDERED.**

**C. WESTON HOUCK**
**UNITED STATES DISTRICT JUDGE**

February 16, 2006
Charleston, South Carolina

LEXSEE 2005 U.S. DIST. LEXIS 18911

**SIERRA CLUB, et al., Plaintiffs, v. FRAN MAINELLA, Director of the National
Park Service, et al., Defendants.**

**Civil Action No. 04-2012 (JDB)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2005 U.S. Dist. LEXIS 18911*

**September 1, 2005, Decided
September 1, 2005, Filed**

**COUNSEL:** [*1] For SIERRA CLUB, SIERRA CLUB LONE STAR CHAPTER, SIERRA CLUB OHIO CHAPTER, SIERRA CLUB RIO GRANDE CHAPTER, SIERRA CLUB WEST VIRGINIA CHAPTER, Plaintiffs: Eric Robert Glitzenstein, Howard M. Crystal, Tanya Sanerib, MEYER GLITZENSTEIN & CRYSTAL, Washington, DC.

For FRAN MAINELLA, Director, National Park Service, GALE NORTON, Secretary, U.S. Department of the Interior, Defendants: Lauren Beth Fischer, U.S. DEPARTMENT OF JUSTICE, Washington, DC.

**JUDGES:** JOHN D. BATES, United States District Judge.

**OPINIONBY:** JOHN D. BATES

**OPINION:**

### MEMORANDUM OPINION

Plaintiffs challenge three related actions by the National Park Service ("NPS") that implement the provisions of 36 C.F.R. Part 9, Subpart B ("9B Regulations") governing private oil and gas drilling operations within units of the National Park System. Plaintiffs contend that defendants have acted in violation of the Administrative Procedure Act ("APA"), *5 U.S.C. § 553*, the National Environmental Policy Act ("NEPA"), *42 U.S.C. § § 4321, et seq.*, and the National Park Service Organic Act, *16 U.S.C. § 1*, by taking actions that allegedly mandate and implement a new approach limiting [*2] NPS's authority to regulate "directional" oil and gas drilling -- that is, the practice of drilling at a slant adjacent to and outside of Park boundaries to extract privately owned oil and gas beneath the Park unit surface. The challenged actions consist of a guidance document issued in November 2003 discussing the criteria for obtaining an exemption from the 9B Regulations, and two site-specific NPS actions granting exemptions and finding no significant impact on the environment under NEPA.

Defendants move to dismiss for lack of subject matter jurisdiction pursuant to *Fed. R. Civ. P. 12(b)(1)* on the grounds that Plaintiffs lack standing and there is no final agency action before the Court. n1 For the reasons explained below, the motion to dismiss is granted in part and denied in part.

> n1 For ease of reference, the Court will refer to defendants' memorandum in support of its motion to dismiss as "Defs.' Mem." and Plaintiffs' memorandum in support of its opposition thereto as "Pls.' Mem." The exhibits attached to each memorandum are referred to as "Defs.' Ex." and "Pls.' Ex."

[*3]

### BACKGROUND

**I. Statutory and Regulatory Background**

The Organic Act is the general authorizing statute for the National Park Service. It provides that:

There is created in the Department of the Interior a service to be called the National Park Service. . . . The service thus established shall promote and regulate the use of the . . . national parks . . . by such means and measures as conform to the fundamental purpose of the said parks . . . which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

*16 U.S.C. § 1*. The Secretary of the Interior shall issue "such rules and regulations as he may deem necessary or proper for the use and management of the parks . . . under the jurisdiction of the National Park Service." n2 *Id. § 3*. Because the Organic Act is silent as to the specifics of park management, the Secretary has broad discretion on how to implement the statute. *Davis v. Latschar, 340 U.S. App. D.C. 136, 202 F.3d 359, 365 (D.C. Cir. 2000).* [*4]  In furtherance of its responsibilities under the Organic Act, NPS also periodically issues a "Management Policies" document "designed to provide NPS management and staff with . . . updated information on NPS policy and required and/or recommended actions." See 2001 Management Policies at 6 (Defs.' Ex. 6).

> n2 The enabling legislation creating the Big Thicket National Preserve in Texas -- the Park unit affected by the directional drilling exemptions at issue here -- similarly provides that "such lands shall be administered by the Secretary as a unit of the National Park System in a manner which will assure their natural and ecological integrity in perpetuity in accordance with the provisions of *sections 698 to 698e* of this title and with the provisions of *sections 1* and *2* to 4 of this title [the Organic Act]." *16 U.S.C. § 698c(a).*

The NPS promulgated the 9B Regulations in 1978 to address the exercise of rights to oil and gas owned by private entities where access is on, across, or [*5]  through federally owned or controlled land or waters. See 36 C.F.R. § 9.30(a). Such rights arise most frequently where the land within a Park unit is owned in fee by a private party, including the right to oil and gas, or, most relevant here, "when in a transfer of the surface estate to the United States, the grantor reserved the rights to the oil and gas." Id. The regulations generally prohibit the granting of access through federal lands or waters unless the operator has an approved "plan of operations," which "serves as the operator's access permit" and sets forth information regarding, inter alia, the various "environments to be affected by operations" and "steps to be taken . . . to mitigate any adverse environmental effects." Id. § § 9.32(a), 9.36(a)(16). Operators subject to the 9B Regulations also must take "all technologically feasible precautions" to prevent a well from blowing open or becoming wild and to prevent accidents and fires. Id. § § 9.44, 9.46. Any operator outside the boundaries of a Park unit must comply with these requirements if he is using directional drilling techniques which result in the drill hole crossing into [*6]  the unit and passing under any federal land or water. Id. § 9.32(e). However, an exemption is available where "the Regional Director is able to determine from available data, that such operations pose no significant threat of damage to park resources, both surface and subsurface, resulting from surface subsidence, fracture of geological formations with resultant fresh water aquifer contamination, or natural gas escape, or the like." Id.

NEPA requires a federal agency to prepare an environmental impact statement ("EIS") for all "proposals for . . . major federal actions significantly affecting the quality of the human environment." *42 U.S.C. § 4332(2)(C).* The EIS must include, among other things, "a detailed statement describing the reasonably foreseeable environmental impact both of the proposed federal action and of any feasible alternative(s) to the proposed federal action." *Wyoming Outdoor Council v. U.S. Forest Service, 334 U.S. App. D.C. 98, 165 F.3d 43, 49 (D.C. Cir. 1999)* (internal quotations omitted). An EIS is not required if the agency makes a determination based on an "environmental assessment" that the proposed action would not have a significant [*7]  impact on the environment. 40 C.F.R. § § 1501.4, 1501.8, and 1508.13. The Supreme Court has explained that "it is now well-settled that NEPA itself does not mandate particular results, but simply describes the necessary process." *Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350, 104 L. Ed. 2d 351, 109 S. Ct. 1835 (1989).* Thus, "NEPA merely prohibits uninformed -- rather than unwise -- agency action." *Id. at 351.*

## II. Factual Background

The following facts are taken from Plaintiffs' amended complaint and the documents quoted therein, which Plaintiffs have, as a practical matter, incorporated by reference. Private entities hold title to subsurface minerals at more than a dozen Park units. In February 1992, the Park Service issued a document entitled "NPS Procedures Governing Nonfederal Oil and Gas Rights" implementing the 9B Regulations ("1992 9B Procedures"). Defs.' Ex. 3. Plaintiffs characterize this document as containing a section entitled "Potential Threats to Park Resources and Values from Directional Drilling Operations Outside a NPS Unit," which mandates consideration of certain [*8] types of threats when reviewing an application for a § 9.32(e) exemption. Am. Compl. P 31. Such potential threats include those caused by "downhole" operations -- that is, the actual subsurface drilling occurring within Park boundaries -- and by the drilling activity outside of the Park unit, including water and soil contamination from the surface well pad; soil erosion and surface runoff from access roads and the well pad; nuisance or safety hazards from gases; fire hazards from equipment at the well pad; and air pollution from extraction equipment, transport vehicles, and gas leaks at the well pad. Id. The scope of this mandated assessment is consistent with the NPS Management Policies issued through notice and comment rulemaking in 2001, which provide that NPS may need to carry out "strategies and actions beyond Park boundaries" in order to protect park resources. Id. P 32 (quoting 2001 Management Policies at §§ 1.5, 3.1).

Mr. Ross Davis of Davis Brothers Oil Producers, Inc., contacted NPS Director Fran Mainella and other NPS officials on October 31, 2001, regarding his company's application for directional drilling at Big Thicket National Preserve, asserting that [*9] NPS lacked jurisdiction to regulate the surface location of the proposed well because it was outside of Big Thicket's boundaries. P Id. P 33. On December 20, 2001, a Park Service official responded to Davis's letter, stating that NPS would "streamline the process" for "all future drilling applications under § 9.32(e). . . ." Id. P 34.

On May 21, 2003, NPS issued a document without notice and comment entitled "Implementation of the Directional Drilling Provision of NPS Nonfederal Oil and Gas Regulations at 36 CFR 9B" (hereinafter "May 2003 Directive"). The document stated that:

> [NPS] jurisdiction under these regulations does not extend to any activities occurring outside park boundaries, even if such activities are associated with a nonfederal oil and gas operation occurring inside a park. . . . Section 9.32(e) . . . is limited in scope to those aspects of the directional drilling operation occurring within park boundaries. As promulgated, it does not provide a means for the NPS to assert regulatory authority under the 9B regulations over surface and subsurface operations occurring outside park boundaries.

Id. at 1 (Defs.' Ex. 2). The Directive highlighted [*10] the use of the term "operations" in § 9.32(e) and noted the limitation in the definition of "operations" to "all functions, work and activities within a unit." Id. at 2 (emphasis in original). It thus concluded that "the potential impacts considered [in making an exemption determination] relate only to effects on park resources from downhole activities occurring within the boundary of the park, not threats to park resources associated with the operation outside park boundaries." Id. at 1, 2 (quoted in Am. Compl. P 35).

NPS issued the "Final Guidance on Implementing the Directional Drilling Provision of the Service's Nonfederal Oil and Gas Regulations at 36 CFR 9B" ("2003 Guidance") on November 13, 2003. Defs.' Ex. 4A-4B. The 2003 Guidance reiterates the § 9.32(e) exemption process as described in the May 2003 Directive, and "describes [NPS] compliance responsibilities in evaluating a request for an exemption" with regard to NEPA and other environmental statutes. Am. Compl. P 36; 2003 Guidance at 6-10. The 2003 Guidance was issued without public notice or opportunity for public comment, and was not the subject of an environmental review under NEPA. Am. Compl. [*11] PP 38, 39.

Since that time, NPS has approved several requests for exemption pursuant to § 9.32(e). Id. P 42. In August 2004, NPS issued an environmental assessment ("EA") for a proposal by Comstock Oil and Gas, Inc. ("Comstock") to directionally drill and produce a well below the Big Sandy Creek Unit of Big Thicket, from a surface location 300 feet from the Unit, utilizing a wellpad extending within 100 feet from the Unit boundary. Id. & Pls.' Ex. 2. Consistent with the 2003 Guidance, the EA states that "potential impacts considered in the § 9.32(e) exemption process relate only to effects on park resources from downhole activities [and] not threats to park resources associated with the operation outside park boundaries." Am. Compl. P 43 (quoting EA at 6). In the public comment process, Plaintiffs commented that the exemption analysis improperly excluded consideration of threats from surface operations outside of Unit boundaries, and submitted that the EA must set forth alternatives beyond the no-action alternative proposed, as well as a more comprehensive evaluation of the impacts of the proposed operation. Id. P 44. Without considering the impact of the nearby

surface [*12] operations, NPS issued a "finding of no significant impact" ("FONSI") under NEPA, which also concluded that Comstock qualified for the § 9.32(e) exemption relying on language from the 2003 Guidance. Id. P 45.

Another Comstock directional drilling proposal at the Big Sandy Creek Unit was the subject of a separate EA in September 2004. Id. P 47 & Pls.' Ex. 1. This well would also have a surface location 300 feet from the Unit, utilizing a wellpad extending within 100 feet from the Unit boundary. Am. Compl. P 47. NPS applied substantially the same approach as with the first Comstock action in its § 9.32(e) exemption analysis, excluding consideration of the threats to park resources from surface operations outside of the Unit, and issued a FONSI determination that also granted this second exemption on November 4, 2004. Id. PP 48-49.

Plaintiffs' amended complaint raises three claims for relief. First, they assert that NPS acted in violation of the APA by issuing the 2003 Guidance, and by applying the Guidance in the Comstock determinations, without providing public notice and an opportunity for public comment and, furthermore, that such actions were arbitrary and capricious. [*13] Plaintiffs next contend that NPS acted contrary to the Organic Act and NPS Management Policies in violation of the APA because the Guidance abandons a long-standing regulatory process requiring a demonstration of no impairment of park wildlife and resources. They point to the Comstock determinations as specific actions that failed to consider such impacts from surface activities. Plaintiffs last claim for relief alleges that NPS acted contrary to NEPA in violation of the APA by issuing the 2003 Guidance without conducting a NEPA environmental review and by issuing the Comstock determinations without considering whether surface activities pose a threat to Park resources.

### STANDARD OF REVIEW

Under *Fed. R. Civ. P. 12(b)(1)*, the plaintiff bears the burden of establishing that the court has jurisdiction. *Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001)*(a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority"); see also *Pitney Bowes, Inc. v. United States Postal Serv., 27 F. Supp. 2d 15, 18 (D.D.C. 1998)*. [*14] Although a court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to *Rule 12(b)(1)*, see *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, 122 L. Ed. 2d 517, 113 S. Ct. 1160, (1993)*, the court need not accept legal conclusions as true, *Boyd v. O'Neill, 273 F. Supp. 2d 92, 95 (D.D.C. 2003)*. Furthermore, "'plaintiff '[s'] factual allegations in the complaint . . . will bear closer scrutiny in resolving a *12(b)(1)* motion' than in resolving a *12(b)(6)* motion for failure to state a claim." *Grand Lodge, 185 F. Supp. 2d at 13-14* (quoting 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350). Additionally, a court may consider material other than the allegations of the complaint in determining whether it has jurisdiction to hear the case. See *Coalition for Underground Expansion v. Mineta, 357 U.S. App. D.C. 72, 333 F.3d 193, 198 (D.C. Cir. 2003)*; *EEOC v. St. Francis Xavier Parochial Sch., 326 U.S. App. D.C. 67, 117 F.3d 621, 624-25 n. 3 (D.C. Cir. 1997)*; *Hohri v. United States, 251 U.S. App. D.C. 145, 782 F.2d 227, 241 (D.C. Cir. 1986)*. Thus, "where necessary, [*15] the court may consider the complaint supplemented by undisputed facts evidenced in the record." *Coalition for Underground Expansion, 333 F.3d at 198* (quoting *Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197, 297 U.S. App. D.C. 406 (D.C. Cir.1992))*. Accordingly, an independent inquiry may be undertaken by the court to assure itself of its own subject matter jurisdiction without triggering unnecessary discovery or converting the motion to one for summary judgment pursuant to *Fed. R. Civ. P. 56*. *Haase v. Sessions, 266 U.S. App. D.C. 325, 835 F.2d 902, 907-08 (D.C. Cir. 1987)*. n3

n3 Several of these cases also hold that a court may resolve disputed jurisdictional facts on a *Rule 12(b)(1)* motion to dismiss. *Coalition for Underground Expansion, 333 F.3d at 198*; *Herbert, 974 F.2d at 197*; *Haase, 835 F.2d at 907*; accord *Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995)*. Another recent case, *Jerome Stevens Pharmaceuticals, Inc. v. FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005)*, however, holds that a court's ability to look to extra-pleading materials does not include the authority to resolve disputed facts. Id. ("the district court may consider materials outside the pleadings when deciding a motion to dismiss for lack of jurisdiction, but it must still accept all of the factual allegations in the complaint as true"). Although citing Herbert, Jerome did not address the extensive discussion in Herbert (and other cases) regarding the authority of the trial court to resolve disputed jurisdictional facts, as long as any necessary procedural protections, such as discovery or an evidentiary hearing, are provided to the plaintiff. *Herbert 974 F.2d at 197*. Accordingly, the Court concludes that the law in this Circuit continues to authorize the resolution of disputed jurisdictional facts. The Court finds it unnecessary to resolve any factual disputes to resolve the pending motion, but notes that to the extent Plaintiffs' recitation of the documents at issue -- the 2003 Guidance and 1992 9B Procedures -- conflicts with the

documents themselves, the Court relies on the documents. Such a "factual resolution," of course, requires no discovery or evidentiary hearing.

[*16]

A motion to dismiss for lack of subject matter jurisdiction under *Fed. R. CIV. P. 12(b)(1)* should not prevail "unless Plaintiffs can prove no set of facts in support of their claim which would entitle them to relief." *Kowal v. MCI Commun. Corp., 305 U.S. App. D.C. 60, 16 F.3d 1271, 1276 (D.C. Cir. 1994); Beverly Enters., Inc. v. Herman, 50 F. Supp. 2d 7, 11 (D.D.C. 1999).* At the stage of litigation when dismissal is sought, a Plaintiffs complaint must be construed liberally, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts. See *St. Francis Xavier Parochial Sch., 117 F.3d at 624.*

**DISCUSSION**

**I. Standing**

Defendants contend that the Court lacks subject matter jurisdiction over this matter on the ground that Plaintiffs lack injury sufficient to establish standing. Plaintiffs respond that the amended complaint sufficiently alleges how the procedural violations under the APA and NEPA harm their aesthetic and recreational interests in Big Thicket and other parks, as well as cause a demonstrable increased risk of environmental damage to [*17] those parks. n4

> n4 Plaintiffs' amended complaint also alleges informational injury flowing from the procedural violations of NEPA and the APA. However, Plaintiffs emphasized at the motions hearing, and in their supplemental briefing, that they rely primarily on their allegations of aesthetic harm to establish standing. Tr. at 68. In light of the Court's conclusion that Plaintiffs have standing based on the aesthetic injuries described above, the Court finds it unnecessary to address the issue of informational injury.

It is well-settled that there are three minimum elements necessary to establish standing:

> First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not conjectural' or hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and [*18] not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992)*(citations and footnote omitted); accord *Center for Law and Educ. v. Dep't of Educ., 364 U.S. App. D.C. 416, 396 F.3d 1152, 1157 (D.C. Cir. 2005).* n5

> n5 An association has representational standing if: (1) at least one of its members has standing to sue in his or her own right; (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit. *American Library Ass'n v. FCC, 401 F.3d 489, 492 (D.C. Cir. 2005).* In this case, the Court finds no reason to doubt that Plaintiffs satisfy the latter two requirements of the associational standing test, and defendants do not contend otherwise. Therefore, the focus of the standing inquiry is on whether at least one of Plaintiffs' members has individual standing to sue.

[*19]

Plaintiffs assert that their amended complaint satisfies the first element -- injury-in-fact -- through the following allegations. Plaintiffs and their members regularly use and enjoy Big Thicket and other parks where the 2003 Guidance

applies to directional drilling, including the areas in close proximity to the Comstock sites. Am. Compl. PP 4, 7, 9, 12. Plaintiffs further allege that defendants' actions are injuring Plaintiffs' experiences by allowing oil and gas drilling to occur in immediate proximity to the Parks and that those actions are "increasing the likelihood that oil and gas development will result in the destruction of wildlife, habitat, and other natural resources in the National Park System enjoyed by Sierra Club members." Id. P 5; see also PP 9, 10, 13.

While Plaintiffs believe the factual allegations in their amended complaint are sufficient by themselves to establish standing, they also have submitted the declaration of Brandt Mannchen, a member of plaintiff Sierra Club and an individually-named plaintiff in this case. He describes the injury to his aesthetic and recreational interests, and the increased risk of environmental harm, as follows:

> 3.  [*20]  . . . [The Comstock] decisions harm my aesthetic and recreational enjoyment of Big Thicket and the surrounding areas, because the NPS is failing to consider impacts to Big Thicket from directional drilling surface activities immediately adjacent to the Preserve due to the NPS's new 2003 Guidance on oil and gas drilling. As a result, the NPS is not fulfilling its duty to prevent the impairment of Park resources by, for example, requiring the imposition of mitigation measures or the development of a plan of operations to protect the Preserve.

> 4. My recreational and aesthetic enjoyment of Big Thicket, and nearby areas, is harmed by these failures in several ways. Because the risk of oil spills, fires, or otherwise "wild" wells and their damaging effects on the environment are no longer accounted for in permitting directional drilling operations in close proximity to Big Thicket, there is a markedly increased chance that one of these disasters will come to pass. . . .

> 5. . . . Operations that increase noise levels in the Preserve impact my ability to watch birds and other animals that disperse as a result of increased noise, my opportunity to enjoy the natural sounds, and [*21] my ability to enjoy solitude and quiet in the Preserve. Other aspects of these surface operations that NPS no longer considers include potential increases in air pollution, introduction of exotic plant species, and the general diminishment of the biodiversity of Big Thicket from which I derive great aesthetic enjoyment.

Mannchen Decl. PP 3-5 (Pls.' Ex. 3)(emphasis added).

Defendants contend that the increased risks of environmental harm averred in the complaint and declaration amount only to speculation about a hypothetical risk of harm insufficient to establish injury-in-fact under *Florida Audubon Soc'y v. Bentsen, 320 U.S. App. D.C. 324, 94 F.3d 658 (D.C. Cir. 1996)*(en banc). In that case, the court of appeals held that, to demonstrate injury sufficient for standing in a procedural rights case, such as NEPA and APA cases, the plaintiff must show that the omission or insufficiency of the procedure has "demonstrably increased [the] risk of serious environmental harm" that "actually threatens the Plaintiffs particular interests." *Id. at 667*; see also *Commonwealth of Massachusetts v. EPA, 367 U.S. App. D.C. 282, 415 F.3d 50, 60 (D.C. Cir. 2005)* (Sentelle, J., concurring)(applying [*22] "demonstrably increased risk" standard in cases outside of NEPA). Moreover, on the causation prong, "a proceduralrights plaintiff must show . . . that it is substantially probable that the procedural breach will cause the essential injury to the Plaintiffs own interest." *Florida Audubon Soc'y, 94 F.3d at 664-65*. Thus, "the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury." *Id. at 664*.

The Court will consider both the allegations of the amended complaint and the Mannchen declaration in conducting the standing inquiry. Plaintiffs correctly note that the extent of Plaintiffs' burden to demonstrate standing varies with the procedural context of the case, and thus, "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice,' for on a motion to dismiss, the court presumes that general allegations embrace the specific facts that are necessary to support the claim." *Defenders of Wildlife, 504 U.S. at 561* [*23]  (quoted in *Sierra Club v. EPA, 352 U.S. App. D.C. 191, 292 F.3d 895, 898-99 (D.C. Cir. 2002))*. However, as discussed above, see *supra at 8-9*, this general principle is not inconsistent with a court inquiring into the proper exercise of its jurisdiction, including reviewing evidence outside of the complaint, so long as any necessary procedural protections are provided to the plaintiff. See *Coalition for Underground Expansion, 333 F.3d at 198* (rejecting Plaintiffs claim that court's consid

eration of declaration to determine standing was inappropriate, relying on Herbert for the principle that "where necessary, the court may consider the complaint supplemented by undisputed facts" evidenced in the record).

Here, the only materials the Court relies on to determine standing are the documents referenced by plaintiff -- the Mannchen declaration, the Comstock environmental assessments, and the 1992 9B Procedures. Thus, there is no prejudice to plaintiff from the Court's reliance on these documents -- and no need to take discovery of defendants since defendants rely on legal arguments -- rather than extra-record facts -- to challenge the standing of Plaintiffs.

The Court [*24] finds that Mannchen sufficiently describes a demonstrable increased risk of serious environmental harm, which in turn results in a particularized injury to his aesthetic and recreational enjoyment of specific Parks affected by directional drilling. First, he visits and recreates in the Big Sandy Creek Unit on a regular basis, where Comstock has been authorized by NPS to conduct directional drilling pursuant to the exemption provision in § 9.32(e). The drilling operations will result in increased noise levels which will impact his ability to watch birds and other animals that will disperse as a result of increased noise. Moreover, the risk of oil spills and fires from above-ground drilling activities outside of Park boundaries will no longer be considered in making exemption determinations, which will result in a markedly increased chance that such a disaster may occur.

Defendants are correct that some of the risks described by Mannchen are somewhat speculative. However, the Court concludes that the increase in risk of harm to the environment is sufficiently concrete to establish standing at this stage of the proceedings. Little, if any, speculation is involved in concluding that [*25] noise from the above-ground drilling operations adjacent to the Big Sandy Creek Unit will cause wildlife to disperse. The environmental assessments themselves attest to this. See EA for the Collins # 3 Well at 17-18 (Pls.' Ex. 2)("Elevated noise could displace wildlife, but most wildlife is expected to return after becoming acclimated to some noise disturbance. Displaced wildlife could increase competition in adjacent areas over the short-term.").

The increased risk of wildfires described by Mannchen further demonstrates a concrete injury to Plaintiffs' particularized interest in using the affected areas. *Mountain States Legal Found. v. FERC, 320 U.S. App. D.C. 87, 92 F.3d 1228, 1234 (D.C. Cir. 1996)*, recognizes that wildfires fall in that category of environmental harms that are, by their nature, "probabilistic," but that nonetheless may be sufficient "'to take a suit out of the category of the hypothetical -- provided that the relief sought would, if granted, reduce the probability.'" Id. (quoting *Village of Elk Grove Village v. Evans, 997 F.2d 328, 329 (7th Cir. 1993))*. Here, the increased risk of wildfire is sufficiently concrete. The 1992 9B Procedures Manual [*26] recognizes that "fire hazard" is one of the threats associated with directional drilling. 1992 9B Procedures at 11. Moreover, it is a common sense proposition that, if Plaintiffs prevail in this action, the risk of fire from surface activities adjacent to the park unit will be taken into account in exemption decisions, and the risk will be reduced because, where the risk of fire is indicated, an operator will be subject to the safeguards in an approved "plan of operations." Although difficult to quantify, the risk appears at least as significant as that presented in Mountain States. See *Id. at 1235* (noting the "sensible recognition" in the case law that "the potential destruction of fire is so severe that relatively modest increments in risk should qualify for standing").

Defendants also contend that Plaintiffs lack standing on the ground that they have failed to satisfy the causation and redressability elements of the standing test. Defendants argue that the actual source of the harm to Plaintiffs' interests is not the 2003 Guidance or the Comstock decisions but rather the regulatory language of § 9.32(e) promulgated in 1978, which requires NPS to limit its inquiry for directional [*27] drilling exemptions to the impacts of downhole activities within park unit boundaries. For that same reason, defendants contend that a favorable decision from the Court would provide no redress because the 1978 regulations -- unchallenged here -- would remain in place. However, defendants' argument presumes that it will prevail on the merits -- that is, that the Court will agree with their interpretation of § 9.32(e). This ignores the requirement that, in reviewing standing, a court presumes that the plaintiff will prevail in the action. See *Florida Audubon Soc'y, 94 F.3d at 664 & n.1, 665*. Applying that presumption, the Court finds that Plaintiffs satisfy the causation and redressability elements. Hence, because the Court also concludes that a sufficient showing of injury-in-fact has been made at the motion to dismiss stage, Plaintiffs have met their burden of establishing standing.

## II. Final Agency Action

### A. 2003 Guidance Document

Plaintiffs claim a right to judicial review of the 2003 Guidance under the APA, which provides for review of "agency action" that is "final." n6 *5 U.S.C. § § 702, 704*. Defendants contend that the [*28] 2003 Guidance is not "agency action" within the meaning of the APA or, alternatively, that the Guidance is not a "final agency action" because it creates no obligations beyond those previously established by regulation. They characterize the Guidance

document as only reiterating the requirements of the 9B Regulations in order to correct the misapplication of those regulations at one park. In contrast, Plaintiffs contend that the 2003 Guidance sets forth a new interpretation of the 9B Regulations that departs from NPS's past long-standing interpretation and, as such, constitutes both an "agency action" and a "final agency action."

> n6 Neither the Organic Act nor NEPA creates a private right of action for violations of its provisions.

Before turning to an assessment of the final agency action question, the Court addresses the threshold issue, raised by Plaintiffs, of whether it should resolve this question at the motion to dismiss stage at all. Plaintiffs contend that the issue whether the 2003 Guidance creates [*29] new obligations is closely intertwined with the merits -- whether the Guidance was issued in compliance with APA procedures -- and thus, pursuant to *Herbert v. Nat'l Acad. of Sciences, 974 F.2d at 198*, a decision should be deferred until the merits are heard or, alternatively, that discovery should be permitted. However, Herbert suggests such deferral or discovery only where the court must rule on "disputed jurisdictional facts." Id. That is not the case here because the analysis turns primarily on the text of three documents -- the 9B Regulations, the 1992 9B Procedures, and the 2003 Guidance. The Court does not rely on the NPS declaration submitted by defendants to determine the meaning of any of these documents or to otherwise determine whether the 2003 Guidance constitutes final agency action. The regulations and documents speak for themselves. Under these circumstances, no discovery is appropriate. Nor is submission of the full administrative record necessary to determine whether the 2003 Guidance effected a change in agency interpretation of the 9B Regulations from that expressed by NPS in 1992.

The requirements for "agency action" and "final agency [*30] action," although often analyzed separately, substantially overlap in their focus on whether the action at issue creates new legal obligations or consequences or sets forth a new interpretation of the law. Specifically, the APA defines "agency action" to include a "rule," n7 which in turn is defined as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency. . . ." *5 U.S.C. § 551(4)*(emphasis added). To satisfy the finality requirement, the agency action must "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear, 520 U.S. 154, 177-78, 137 L. Ed. 2d 281, 117 S. Ct. 1154 (1997)* (quoted in *National Ass'n of Home Builders v. Norton, 367 U.S. App. D.C. 240, 415 F.3d 8, 13-14 (D.C. Cir. 2005)*). n8 Thus, defendants' arguments, although cast separately, raise the same issue: whether the 2003 Guidance creates any new legal obligations or sets forth a new interpretation of law. n9

> n7 "Agency action" is defined, in full, as "the whole or a part of any agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *5 U.S.C. § 551(13)*.

[*31]

> n8 The other element for "final" agency action is that the action under review "must mark the consummation' of the agency's decisionmaking process." *Bennett v. Spear, 520 U.S. at 177-78*. Defendants do not contend that the 2003 Guidance lacks finality as to that element. Indeed, the issuance of the preliminary guidance on the subject of the § 9.32(e) exemption, followed by "extensive input from the Solicitor's Office and staff specialists," field review, and headquarters review, and then its issuance under a cover memo labeling the document "Final Guidance," leaves little room for making such an argument.

> n9 Plaintiffs' focus on the use of mandatory language in the 2003 Guidance as indicia of final agency action, and their reliance on cases to that effect, is misplaced. The key to those cases was not simply the use of mandatory language, but rather the creation of new legal obligations or consequences that did not exist before. See, e.g., *Natl Ass'n of Home Builders v. United States Army Corps of Eng'rs, 417 F.3d 1272, 2005 WL 1789740, *3, *6 (D.C. Cir. 2005)* (regulatory general permits under review that "reduced the authorized maximum acreage impact" of construction activity allowed by earlier versions of the permits "create legal rights and impose binding obligations" despite possibility that affected parties may obtain another type of permit); *Appalachian Power Co. v. EPA, 341 U.S. App. D.C. 46, 208 F.3d 1015, 1028 (D.C. Cir. 2000)*("we are convinced that elements of the Guidance . . . significantly broadened the 1992 rule"); *CropLife America v. EPA, 356 U.S. App. D.C. 192, 329 F.3d 876, 884 (D.C. Cir. 2003)*("Because the new rule [in the form of a press release] effects a dramatic

change in the agency's established regulatory regime," notice and comment procedures were required.). Thus, as explained above, the Court focuses its inquiry on whether the 2003 Guidance creates new legal obligations or consequences, or sets forth a new interpretation of law.

[*32]

Defendants contend that the Guidance does not change any "law or policy" because the legal criteria governing § 9.32(e) exemptions are created by the 9B Regulations promulgated in 1978, not by the 2003 Guidance. According to defendants, the "plain language" of the 9B Regulations limit the exemption process to those aspects of the directional drilling operation occurring within the boundary of a park unit -- that is, threats to park resources from the downhole activities within the boundary, which necessarily excludes from consideration threats to park resources associated with surface activities outside park boundaries -- and the 2003 Guidance only reiterates this limitation. See 2003 Guidance at 2, 3. This argument relies heavily on the focus of the § 9.32(e) exemption criteria on impacts from "operations" and a separate definitions provision in § 9.31(c) that appears to limit "operations" to activities that occur "within a unit." Id.

Before parsing through the regulatory text relating to this "plain language" argument, the Court pauses to explain the standard of review that applies to defendants' characterization of the regulatory text. Defendants submit that their [*33] "interpretation" is entitled to substantial deference, pursuant to *Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 129 L. Ed. 2d 405, 114 S. Ct. 2381 (1994)*("We must give substantial deference to an agency's interpretation of its own regulation."). However, the Supreme Court has more recently stressed that judicial deference to an agency's interpretation "is warranted only when the language of the regulation is ambiguous." *Christensen v. Harris County, 529 U.S. 576, 588, 146 L. Ed. 2d 621, 120 S. Ct. 1655 (2000)*; In *Re Sealed Case, 345 U.S. App. D.C. 19, 237 F.3d 657, 667 (D.C. Cir. 2001)*. n10 Because the crux of defendant's argument is that the plain language of § 9.32(e), as its terms are defined in § 9.31, is capable of only one meaning -- and hence lacks any ambiguity -- the Court considers de novo whether the plain language of the 9B Regulations forecloses consideration of threats to park resources from surface activities outside of park unit boundaries.

    n10 This principle is implicit in Thomas Jeffers Univ., where the Supreme Court explained that courts "must defer to [an agency's] interpretation unless an alternative reading is compelled by the regulation's plain language'. . . ." *512 U.S. at 512* (emphasis added).

[*34]

Section 9.32(e) states that operators using directional drilling techniques causing the drill hole to cross into a park unit must comply with the 9B Regulations:

    Except, that the operator need not comply in those areas where, upon application of the operator or upon his own action, the Regional Director is able to determine from available data, that such operations pose no significant threat of damage to park resources, both surface and subsurface, resulting from surface subsidence, fracture of geological formations with resultant fresh water acquifer contamination, or natural gas escape, or the like.

The term "operations" is, in turn, defined as:

    All functions, work and activities within a unit in connection with exploration for and development of oil and gas resources, the right to which is not owned by the United States, including: gathering basic information required to comply with this Subpart, prospecting, exploration, surveying, preproduction development and production; gathering, on-site storage, transport or processing of petroleum products; surveillance, inspection, monitoring, or maintenance of equipment; reclamation of the surface disturbed [*35] by such activities; and all activities and uses reasonably incident thereto performed within a unit, including construction or use of roads, pipelines, or other means of access or transportation on, across, or through federally owned or controlled lands and waters, regardless of whether such activities and uses take place on Federal, State or private lands.

36 C.F.R. § 9.31(c)(emphasis added). This geographical limitation is further reiterated in the purpose and scope section of the 9B Regulations, which expressly provides that the regulations apply only to "activities within any unit of the National Park System." Id. § 9.30(a)(emphasis added).

This recitation of the regulatory text leaves no room for debate: the plain language of the 9B Regulations limits NPS's exemption process to consideration of impacts from activities within a unit. Reading § 9.32(e) with the definition of "operations" substituted in place of that term in brackets, § 9.32(e) provides for an exemption where "the Regional Director is able to determine from available data, that such [functions, work and activities within a unit in connection with exploration for [*36] and development of oil and gas resources, the right to which is not owned by the United States, including . . . all activities and uses reasonably incident thereto performed within a unit] pose no significant threat of damage to park resources . . ." The plain language thus limits NPS to considering impacts resulting from "activities within a unit," and leaves no room for consideration of impacts from activities outside of a park unit.

Plaintiffs nonetheless contend that the regulations are ambiguous with regard to impacts from activities outside of a park unit and, furthermore, that defendants have reversed their prior interpretation of § 9.32(e). They cite three regulatory provisions in support of their ambiguity characterization, none of which alters the limitation of "operations" to activities "within a unit." First, they focus on the last clause of the definition of operations which provides that the term includes "all activities and uses reasonably incident thereto performed within a unit . . . regardless of whether such activities and uses take place on Federal, State or private lands." Plaintiffs cite the dictionary definition of "thereto" as meaning "to that," "to it", [*37] or -- paraphrasing the dictionary -- to those, which they would then incorporate into the clause as follows: "all activities and uses reasonably incident [to those] performed within a unit . . . regardless" of where the activities take place. Pls.' Mem. at 35 & n. 16. However, this strained reading of "thereto" ignores the first and primary sentence of the definition, which states that "operations" are "functions, work and activities within a unit in connection with exploration for and development of oil and gas resources . . . including" the stated list of activities. The clause regarding "reasonably incident" activities quoted by Plaintiffs is the final example of activities "includ[ed]" in "functions, works and activities within a unit," and thus must be a subset of the "functions, work and activities within a unit." See *P.C. Pfeiffer Co. v. Ford, 444 U.S. 69, 77 n.7, 62 L. Ed. 2d 225, 100 S. Ct. 328 (1979)* (the word "including" indicates that the enumerated activities "are a part of the larger group of activities" described before the word "including"); see also *Dong v. Smithsonian Inst., 326 U.S. App. D.C. 350, 125 F.3d 877, 880 (D.C. Cir. 1997)*(noting that the word "includes" normally [*38] "sets out examples of some general principle'") (quoting *Federal Land Bank of St. Paul v. Bismarck Lumber Co., 314 U.S. 95, 100, 86 L. Ed. 65, 62 S. Ct. 1 (1941))*. The reference to activities taking place on State and private lands likewise must be read consistent with the limitation from the first sentence. So understood, this provision can refer only to State and private holdings within a park unit -- a conclusion confirmed by agency counsel at the hearing and further supported by the identification of such inholdings in the purpose and scope provision as one of the two types of properties to be addressed by the 9B Regulations. See 36 C.F.R. § 9.30(a)(explaining that the rights to oil and gas located "within" park units addressed by the 9B Regulations "most frequently arise in one of two situations: first, "when the land is owned in fee" within the unit, and second, when a grantor of a surface estate reserves the subsurface rights to oil and gas).

Second, Plaintiffs characterize a separate 9B regulation -- § 9.37(a)(2) -- as recognizing that NPS regulates directional drilling without regard to the boundaries of a park unit. This section provides: "The Regional [*39] Director shall not approve a plan of operations: . . . (2) for operations at a site, the surface estate of which is not owned by the Federal government, where operations would constitute a nuisance to . . . [or] would significantly injure" federal lands or waters. Id. But this provision starts with the limiting phrase "for operations at a site," and again, "operations" are, by definition, activities "within a unit." This provision, then, speaks only to operations taking place on inholdings. NPS assertion of authority over "operations" pursuant to § 9.37(a)(2), therefore, does not create an ambiguity in the use of the term "operations" in § 9.32(e).

Plaintiffs advanced a third source of ambiguity at the motions hearing. See Tr. at 41-43. They contend that the regulatory list of threats to park resources in the § 9.32(e) exemption provision is ambiguous because it ends with the catch-all phrase "or the like." However, "or the like" describes the kinds of threats to park resources that are considered -- not the oil and gas exploration activities causing such threats. As to the oil and gas activities causing the threats, § 9.32(e) is clear: the Regional Director considers [*40] whether "such operations pose no significant threat of damage to park resources. . . ." Impacts falling under the category "or the like" still must be impacts from "operations," as the latter term is defined in § 9.31(c) and employed in § 9.32(e).

Accordingly, looking only at the regulatory text, the Court concludes that the plain language of the regulation limits the impacts that NPS may consider during the exemption process to those impacts from "functions, work and activities within a unit in connection with" oil and gas exploration and development, and thus necessarily excludes consideration of impacts from activities outside of the park unit boundaries. That being the case, the reiteration of this limitation in the 2003 Guidance does not give rise to new legal obligations or legal consequences. As explained in *Indep. Equip. Dealers Ass'n v. EPA, 362 U.S. App. D.C. 53, 372 F.3d 420, 428 (D.C. Cir. 2004)*("IEDA"), an agency document "restating" an agency interpretation is not reviewable "agency action" or "final agency action." See also *Gen. Motors Corp. v. EPA, 363 F.3d 442, 449, 361 U.S. App. D.C. 6 (D.C. Cir. 2004)*(holding that agency statement was not reviewable agency action [*41]  where the agency "repeated its regulatory interpretation" from a prior policy document issued years earlier). This principle extends as well to agency restatements of the requirements of the plain language of a rule, as indicated by the analogy drawn by the IEDA court with respect to the annual republication of regulations in the Code of Federal Regulations: "Just as it would be folly to allow parties to challenge a regulation anew each year upon the annual re-publication of the Code of Federal Regulations, so too it is silly to permit parties to challenge an established regulatory interpretation each time it is repeated." *372 F.3d at 428.* The court in IEDA explained that such a restatement may have certain attributes of a "rule" -- it will be a "statement of general or particular applicability" and be of "future effect insofar as it may inform the future conduct" of the regulated community and, implicitly, the agency. Id. Nonetheless, it will not ultimately constitute a "rule" because, in and of itself, it does not "implement, interpret or prescribe law or policy," because it "tread[s] no new ground." Id.

If the Court had before it only the 9B Regulations [*42]  and the 2003 Guidance, this would be a straightforward matter, applying the principles articulated in IEDA. The case is not quite so simple, however. As noted earlier, Plaintiffs contend that NPS has reversed a prior contrary interpretation of § 9.32(e) that was set forth in the 1992 9B Procedures. Although defendants dispute Plaintiffs' characterization of the 1992 9B Procedures (see Defs.' Mem. at 17), they do concede that the Big Thicket National Preserve office had been applying § 9.32(e) in a manner inconsistent with the plain language of the regulation -- that is, as if the provision allowed NPS to exert regulatory control over the portion of a directional drilling operation occurring outside park unit boundaries." n11 Tr. at 5-6. Plaintiffs agree that NPS staff were indeed exercising such control but then would go one step further -- Plaintiffs assert that NPS interpreted its regulations to require as much in the 1992 9B Procedures. IEDA and General Motors addressed restatements of prior consistent agency interpretations, and that consistency was significant to the analysis. To the extent there is a lack of consistency by the NPS in its interpretation of  [*43]  § 9.32(e) -- a matter addressed in detail below -- the applicability of those cases arguably would be limited. However, the Court finds it significant that in IEDA and General Motors the agency actions at issue were reiterations of "interpretations" in prior guidance documents, in contrast to reiterations of the plain language of a regulation. Interpretations inherently involve ambiguous regulations, and the courts have been wary of interpretations that shift over time through, guidance, letters, and press releases. See, e.g., *Appalachian Power, 208 F.3d at 1020.* However, as the court explained in IEDA, repeating the requirements directly from the Code of Federal Regulations presents an even stronger case for finding no reviewable agency action because previously established regulations are merely being repeated, not changed. *372 F.3d at 428.* Thus, despite the lack of consistency in NPS's prior discussions of § 9.32(e), the Court reads *IEDA* to apply here because the 2003 Guidance repeats the requirements of the plain language of the regulation.

n11 Counsel for defendants indicated that there have been eight instances of such misapplication of § 9.32(e) at Big Thicket. Tr. at 30. The exact number is not germane to the analysis here, but further underscores Plaintiffs' point -- which the Court accepts here -- that the practice of considering impacts from surface activities outside of the park unit was commonplace at Big Thicket National Preserve.

[*44]

Plaintiffs rely heavily on the well-established principle that an agency may not change an interpretation of a regulation without providing public notice and an opportunity to comment. See *Paralyzed Veterans of Am. v. D.C. Arena, L.P., 326 U.S. App. D.C. 25, 117 F.3d 579, 586 (D.C. Cir. 1997)*; *Alaska Prof'l Hunters Ass'n, Inc. v. FAA, 336 U.S. App. D.C. 197, 177 F.3d 1030, 1033-34 (D.C. Cir. 1999)*. "Rule making" under the APA includes the agency process for modifying a rule (*5 U.S.C. § 551(5)*) and, thus, "when an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." *Alaska Prof's Hunters Ass'n, 177 F.3d at 1034.*

As a threshold matter, however, the applicability of Paralyzed Veterans and Alaska Prof'l Hunters Ass'n to the instant action is questionable. Those cases contemplated agency interpretation of an ambiguous regulation. See *Paralyzed Veterans, 117 F.3d at 586* (addressing agency's contention that it was "free to change its interpretation of an ambiguous regulation" [*45] and whether Chevron deference to agency interpretation of ambiguous statutes was applicable to agency regulations); *Alaska Prof'l Hunters Ass'n, 177 F.3d at 1031* (considering whether "commercial operators -- persons who operate aircraft for compensation or hire" included "hunting and fishing guides who pilot light aircraft"). As explained above, the Court concludes that § 9.32(e) is not ambiguous on the subject of the Park's authority to consider impacts from surface activities outside of park unit boundaries. Indeed, had NPS initially issued an interpretation of § 9.32(e) that was contrary to its plain language, that interpretation could not have been upheld. See In *Re Sealed Case, 237 F.3d at 669* (rejecting agency interpretation that conflicted with plain language of agency regulation). Extending Paralyzed Veterans and Alaska Prof'l Hunters Ass'n to situations where an agency is attempting to correct statements that are contrary to the plain language of its regulations would be problematic because the predicate for the holdings in those cases is that the first interpretation is a reasonable one under the APA.

In any event, [*46] however, this issue need not be addressed further because a review of the 1992 9B Procedures reveals that it does not actually contain an interpretation of the § 9.32(e) exemption provision with respect to impacts on park resources from surface activities outside of a park unit. The excerpt cited by Plaintiffs states that "the Regional Director must determine that the proposed directional drilling operation poses no significant threat of damage to unit resources and values." 1992 9B Procedures at 11. The Procedures then list circumstances where "a directional drilling operation would pose a significant threat to unit resources and values," and identify several impacts that would more likely be associated with surface activities, which are necessarily outside of the boundaries of a park unit in a directional drilling situation. Plaintiffs quote the following impacts from the 1992 9B Procedures as falling within this category:

. . . . substantially change wildlife patterns;

. cause an exceedance of an air quality increment . . . under the Clean Air Act;

. drastically change vegetative community structure or composition, including influx of exotic species;

. present [*47] an obvious fire hazard;

. damage cultural resources to a unit.

Pls.' Mem. at 29 (quoting 1992 9B Procedures at 11-12). Plaintiffs further point out that the 2003 Guidance provides revised pages omitting these impacts, and instead listing only those impacts identified in § 9.32(e) itself: "surface subsidence; fracture of geological formations with resultant fresh water contamination; natural gas escape; or the like." See 2003 Guidance, Section V, at 12A (Revised 9B Procedures)(Defs.' Ex. 5).

The broader list of impacts in the 1992 9B Procedures, however, is silent as to whether the impacts must be from activities within a park unit or may also encompass impacts from surface activities outside of unit boundaries. To be sure, as defendants acknowledged at the motions hearing, many of the impacts listed in the 1992 9B Procedures appear to relate to impacts from surface activities. But a directive to consider impacts from surface activities outside of a park unit is not expressly articulated. Thus, to interpret the list as authorizing consideration of impacts from surface activities outside of a park unit would require one to conclude that the listed impacts can result [*48] only from such surface activities, and cannot result from downhole drilling within a unit. Plaintiffs, however, do not make this contention, and indeed such a contention would be implausible. As Plaintiffs acknowledged at the hearing, changes in wildlife patterns, changes in vegetation, fire hazards, damage to cultural resources, and even air quality impacts are all impacts that also could, at least potentially, flow from downhole drilling activities. See Tr. at 43-45. Therefore, the list of impacts to be considered in the § 9.32(e) exemption process falls far short of establishing that NPS has interpreted § 9.32(e) to authorize consideration of impacts from surface activities outside of a park unit.

To be sure, the list in the 1992 9B Procedures may cause confusion to the extent that the impacts are more closely associated with surface activities outside of a park unit, in contrast to downhole drilling within a unit. But such confusion is simply insufficient to establish that NPS has interpreted § 9.32(e) to extend its jurisdiction over surface activities outside of park unit boundaries where operations within the unit do not pose a threat to park resources. The fact that

[*49]  the 2003 Guidance provided revised pages that omitted the foregoing list of impacts in favor of repeating the actual regulatory language of §  9.32(e) does not somehow convert that confusion into an interpretation.

Plaintiffs point to another excerpt from the 1992 9B Procedures as reflecting a prior contrary interpretation, wherein a "step-by-step process to guide NPS managers" in the proper application of the 9B Regulations makes reference to managers gathering information about the surface location of the operator. In this respect, the 1992 9B Procedures Manual states that in going through the §  9.32(e) analysis: "the Superintendent should instruct the operator to submit specific relevant information and the Superintendent should conduct an on-site investigation of the proposed operational location." 1992 9B Procedures at 47. Information to be submitted by the operator "should" include "a brief description of the proposed operation; a map . . . showing the proposed surface location and the bottom-hole location of the well; and actions that the operator will take to prevent adverse impact to unit resources and values." Id. at 47-48. Once again, however, the quoted excerpts fall [*50]  short of establishing that NPS previously interpreted the exemption under §  9.32(e) to require consideration of surface impacts outside of a park unit boundary. The quoted language instructs NPS managers to gather information about the proposed site -- basic information that would be essential to determine where NPS jurisdiction begins and ends. It reveals nothing about how information regarding the surface location should be considered in making the substantive exemption determination. The regulation, on the other hand, is not ambiguous, as discussed at length above. By its plain language, the regulation limits the impacts NPS may consider to those within the park unit.

Indeed, other portions of the 1992 9B Procedures underscore the consistency in excluding impacts from surface activities outside of a park unit from the §  9.32(e) exemption process. The 1992 9B Procedures state that, as to vertical drilling: "If the operator proposes to drill a vertical well outside unit boundaries, the operator is exempt from the 36 CFR 9B regulations. End of process. (See Chapter 6, Enforcement, if the operator damages or injures unit resources or values.)" Id. at 48. In other words, harm [*51]  from the vertical well is foreseeable, but the operator is nonetheless excluded from the 9B Regulations by virtue of having his activities located outside the boundary of the park unit. This statement underscores the importance of locating activities physically within the park unit boundary in order to be subject to the 9B Regulations.

Because the 1992 9B Procedures do not actually contain an interpretation of the §  9.32 exemption criteria with respect to impacts from surface activities outside of the boundaries of a park unit, the statements in the 2003 Guidance limiting NPS consideration to impacts from activities within a park unit -- that is, impacts from downhole drilling -- do not yield a change in interpretation. n12 Rather, the 2003 Guidance is more properly seen, as defendants urge, as a statement of the plain meaning of the 9B Regulations, intended in part to correct misapplication of §  9.32(e). When so viewed, the 2003 Guidance is not final agency action requiring notice and public comment or subject to judicial review.

n12 Plaintiffs amended complaint also references a table in the 1992 9B Procedures -- "Table 5.1" -- that more directly identifies impacts from the "surface wellpad" as impacts to be considered under the §  9.32(e) exemption analysis. Am. Compl. P 31. Plaintiffs later acknowledge in their brief that the table is not in the 1992 9B Procedures, but instead is in a document referred to as a "draft Operator's Handbook" issued in 2004. Pls.' Mem. at 7 n.2; see also Defs.' Mem. at 17 n.8 & Ex. 7. Whether a draft document could constitute an interpretation binding on the agency is highly questionable. See *Southern Utah Wilderness Alliance v. Dabney, 222 F.3d 819, 829 (10th Cir. 2000)* (holding that a draft document did not constitute an interpretation because it "had not yet been finalized or adopted by the agency").

In any event, the Court finds that the cited provisions of the draft handbook addressing the requirements of §  9.32(e) are ambiguous. Under the heading "36 CFR §  9.32(e) Application Process," it is indicated that much of the environmental impact information included in the application is necessary for the NEPA environmental assessment. Id. at 5-3 (information needed for environmental assessment includes "methods that would be used to minimize or avoid impacts on park resources"). But the NEPA environmental assessment considers "the environmental impacts of the proposed action" without the boundary limitations of §  9.32(e), and thus, as Plaintiffs' counsel noted at the hearing, impacts from surface activities occurring outside of a park unit must be considered. The extent to which impacts from surface activities must be considered as part of the §  9.32(e) analysis is not clear from the draft handbook.

Turning next to the list of mitigation measures in Table 5.1, the table does include "suggested mitigation measures" related to reducing impacts from surface activities outside of a park unit. However, what is not present in the table and accompanying text is an interpretation of the terms of §  9.32(e) to authorize NPS to consider

such impacts in the exemption analysis. There is an assumption that NPS will process applications in a certain manner, but no interpretation of the regulation. Thus, the draft Operator's Handbook adds nothing to the analysis here.

[*52]

## B. Comstock FONSI and Exemption Determinations

Defendants recognize that Plaintiffs' amended complaint includes a challenge to the agency decisions relating to two Comstock directional drilling operations that included both findings of no significant impact ("FONSIs") pursuant to NEPA and individual exemption determinations made pursuant to § 9.32(e). Defendants contend that these admittedly "final agency actions" are not judicially reviewable on the ground that Plaintiffs' challenge constitutes an impermissibly broad programmatic challenge to the entire directional drilling program that, as such, is precluded by *Lujan v. National Wildlife Fed'n, 497 U.S. 871, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1990)*. Plaintiffs contend that the FONSI and exemption determinations are garden-variety APA final agency actions for which they seek ordinary APA relief, including setting aside the challenged actions. Although they also seek other relief that clearly goes further, Plaintiffs contend that nothing in the case law precludes them from challenging otherwise reviewable agency actions.

This challenge to the Comstock determinations is not comparable to the programmatic challenge in Lujan. In Lujan [*53] , the Plaintiffs styled their complaint as a challenge to an agency's entire program -- the "land withdrawal review program" -- based on a litany of alleged failures in the agency's administration of the program, as well as "1250 or so individual classification terminations and withdrawal revocations" regarding public lands. *Lujan, 497 U.S. at 875, 881*. The Supreme Court emphasized that the "land withdrawal review program" described by Plaintiffs did not "refer to a single [agency] order or regulation, or even to a completed universe of [agency] orders and regulations, but rather referred to the "continuing operations" of the agency in reviewing withdrawal revocation applications and classifications of public lands. *Id. at 890*. The Court therefore dismissed the challenge even though Plaintiffs styled their complaint as including challenges to 1250 individual classifications. *Id. at 890, 893*. However, the Supreme Court made clear that judicial review would be appropriate "when, and to the extent that, a specific final agency action' has an actual or immediately threatened effect," even where judicial intervention "may ultimately [*54] have the effect of requiring a regulation, a series of regulations, or even a whole program' to be revised by the agency in order to avoid the unlawful result that the court discerns." *Id*.

On that reasoning, in *Sierra Club v. Peterson, 228 F.3d 559 (5th Cir. 2000)*(en banc), the Fifth Circuit rejected a programmatic challenge to a timber management program even though Plaintiffs cited 12 illegal timber sales that were otherwise final agency actions, because Plaintiffs were only using those actions as "evidence" of broad programmatic violations. However, the court emphasized that, on remand, "the proceedings may include a trial limited to any existing specific final agency actions the environmental groups wish to challenge . . . which have an actual or immediately threatened effect.'" *Id. at 570 n. 14*. A similarly broad programmatic challenge was rejected in *Nat'l Wildlife Fed'n v. Caldera, 2002 U.S. Dist. LEXIS 7458, 2002 WL 628649 (D.D.C. 2002)*, because Plaintiffs conceded in their filings that, although citing 23 permits as example of an unlawful program, "the purpose of [Plaintiffs'] case is not to modify a permit. It [is] to deal with the broader [*55] systemic problems with [the] program." *2002 U.S. Dist. LEXIS 7458, [WL] at *4*.

The precedent established by these cases is thus abundantly clear -- Plaintiffs are entitled to judicial review of final agency actions, so long as that review is focused on a discrete final agency action. That is the case here. Plaintiffs' amended complaint encompasses a challenge to the two discrete agency actions setting forth FONSI and § 9.32(e) exemption determinations for two specific sites. n13 Although the relief requested in the complaint is sweeping -- "setting aside all Section 9.32(e) exemption determinations made by [NPS] pursuant to the 2003 Guidance, including the [Comstock] exemption determinations" -- it also includes a request for relief specific to each of those two actions. In light of the Court's dismissal of Plaintiffs' challenge to the 2003 Guidance, there may be little left to the merits of the challenges to the Comstock actions. However, the Court is not in a position at this point to determine the merits of the challenges to the Comstock actions, given the limited focus and briefing on that aspect of Plaintiffs' action to date. It suffices for present purposes to note that the Comstock actions are [*56] judicially reviewable.

n13 Defendants at various points concede that site-specific actions are judicially reviewable. See Defs.' Mem. at 18 n.9; Tr. at 35. However, they would limit the availability of judicial review depending on the relief

sought. As Lujan explained, however, the type of relief sought does not itself determine whether judicial review is available. *Lujan, 497 U.S. at 890.*

**CONCLUSION**

For the foregoing reasons, the Court holds that Plaintiffs have satisfied their burden to establish standing at the dismissal stage, that the 2003 Guidance is not final agency action subject to judicial review, but that the two Comstock decisions are final agency actions subject to judicial review. Accordingly, defendants' motion to dismiss is granted in part and denied in part. A separate order will be issued herewith.

JOHN D. BATES

United States District Judge

Date: September 1, 2005

**ORDER**

Upon consideration of [# 8] defendants' motion to dismiss, and for [*57] the reasons explained in the accompanying Memorandum Opinion issued on this date, it is this 1st day of September, 2005 hereby

**ORDERED** that defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**, it is further

**ORDERED** that the claims for relief in PP 51, 54, and 57 of the amended complaint are dismissed for lack of subject matter jurisdiction; it is further

**ORDERED** that the claims for relief in PP 52, 55, and 58 of the amended complaint are final agency actions subject to judicial review; and it is further

**ORDERED** that the parties shall submit a schedule governing further proceedings in this case by not later than September 15, 2005.

JOHN D. BATES

United States District Judge